IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| LAZ KARP ASSOCIATES, LLC, | |
| *Plaintiff,* | Civil Action No. _____ |
| v. | |
| ANILISE STARRE, | |
| *Defendant.* | |

### DECLARATION OF CAROLYN MALONEY IN SUPPORT OF PLAINTIFF LAZ KARP ASSOCIATES, LLC'S, APPLICATION FOR A PRELIMINARY INJUNCTION

I, Carolyn Maloney, declare as follows:

1. I am the Senior Director of Regional Finance Plaintiff LAZ Karp Associates, LLC ("LAZ"). I make this declaration in support of LAZ's Application for a Preliminary Injunction. I have personal knowledge of the facts stated herein and if called as a witness I could and would testify competently thereto.

2. I have been employed as the Senior Director of Regional Finance at LAZ for approximately fifteen years. I have over twenty years of experience in financial analysis and operations.

3. As a result of my experience and employment at LAZ, I am familiar with LAZ's corporate financials, operational costs, client reporting, business analytics, key performance indicators, and protocols for safeguarding such information.

4. As the Senior Director of Regional Finance, I provide supervision, oversight, support, and development of LAZ's regional controllers worldwide, coordinate and oversee bookkeeping teams, facilitate the budget process through the Regional Controllers within each of LAZ's seven regions, and utilize LAZ data to perform financial analytics. I am also responsible

for developing and tracking key performance indicators across the country to track company health, ensuring compliance with CAPEX processes, and assisting in ad hoc financial requests by Senior Vice Presidents, Presidents, and Home Office and assisting regional controllers in utilizing the tools at their disposal to assist with such requests.

5. I am aware that LAZ implements various agreements, written policies, and electronic security measures to safeguard its proprietary, confidential and trade information (collectively the "Proprietary Information").

6. LAZ's protocols also implement several physical and electronic access controls to protect Proprietary Information, including: (a) securing and locking LAZ facilities, (b) requiring employees to log in with unique credentials to access company devices, (c) permission-restricted folders that only permit authorized employees to access certain information and (d) requiring passwords when emailing sensitive documents within the company to open the attachments.

7. On March 7, 2022, Anilise Starre began employment at LAZ as a Regional Controller over LAZ's Central East Coast Region, which included Pennsylvania, Baltimore, Virginia, and Washington DC (the "Region"). She primarily worked in LAZ's Washington D.C. office.

8. Regional Controllers had access to LAZ's Proprietary Information, especially financial documents, including balance sheets, lists of operational costs for specific client services, and price scaling data. LAZ relies on this information for budgeting, determining employee wages, and setting competitive pricing for its clients.

9. As a condition to their employment, Regional Controllers like Starre must certify that they are aware that their role requires access to substantial Proprietary Information, and that they know that maintaining the confidentiality of such information is paramount to their role.

10. Starre's access to Propriety Information was limited to the scope of her individual duties. Specifically, Starre was responsible for the oversight of all accounting activity within the Region, including overseeing development of the Region's financial plan, solving operational and financial challenges with operational teams, performing financial analyses as requested by regional leadership, maintaining budgets for LAZ's locations within the Region, and serving as a liaison between the Region's operations team and the home office in Connecticut for financial matters. A true and correct copy of Starre's Regional Controller Job Description is attached as Exhibit G to the Complaint.

11. I began supervising Starre in or around July 2024.

12. Immediately, I noticed that Starre had performance issues, including providing inaccurate and incomplete deliverables, and attempted to coach her on an informal basis to help her improve.

13. Others expressed concerns with Starre's performance to me. I often received complaints that Starre submitted delayed responses to requests and emails, and that members of the regional team did not trust Starre to accurately or timely complete assigned tasks.

14. In or around October 2025, at the recommendation of the Region's Vice President and Senior Vice President, I created a performance improvement plan ("PIP") to address the areas where Starre was struggling. The PIP was to last for 7 weeks, and included weekly milestones, with check-ins with Maloney.

15. On October 7, 2025, I sent Starre a Microsoft Teams invitation for a call that was to take place on October 9, 2025, where the PIP would be presented.

16. Starre's performance did not sufficiently improve after the PIP was instituted. Nor did Starre express or exhibit a desire to improve to me. During a call that I had with Starre on

November 3, 2025, I observed that Starre was not willing to put forward the effort necessary to complete her seven-week PIP. For this reason, and Starre's prior history for poor performance, I recommended that LAZ terminate Starre's employment.

17. At or around 9:30 a.m. on November 4, 2025, I informed Starre that her employment was being terminated, effective immediately. The call ended at approximately 10:00 a.m., and Starre turned in her Company laptop and left the office shortly thereafter.

18. On or around November 5, 2025, I accessed Starre's Company email account to determine what outstanding requests that I may need to reassign to other Regional Controllers. After logging in to the email account, I observed that Starre had approximately 3,000 unread emails. I also noticed that Starre used her LAZ email account to forward over 90 emails to her personal Gmail account (the "Misappropriated Emails").

19. I neither instructed nor knew that Starre had sent LAZ's Propriety Information to email account in violation of the above-mentioned agreements.

20. Unbeknownst to I or others within leadership of LAZ, Starre began misappropriating LAZ's Propriety Information by sending Company emails to her personal Gmail account on or around October 8, 2025.

21. From my review of her LAZ email account, I learned that Starre used her LAZ email account to forward 7 Company emails to her personal Gmail account on October 8, 2025.

22. From my review of her LAZ email account, I learned that Starre used her LAZ email account to forward another 31 Company emails to her personal Gmail account on October 10, 2025. Included among that batch of Company emails was LAZ's Home Office Cost Allocation ("HOCA") File. A true and correct copy of the email transmitting the HOCA File is attached as Exhibit H to the Complaint; however, the Proprietary Information in this email has been redacted,

and the HOCA File itself has been removed, to maintain confidentiality until a protective order is entered or this Court directs that the HOCA File be filed under seal.

23. The HOCA File is one of the most valuable pieces of Proprietary Information LAZ possesses, as it contains a list of over 50 services LAZ provides customers from its Connecticut-based headquarters (*i.e.*, the home office) and the baseline operational cost LAZ incurs for each such service for both 2025 and 2026.

24. For example, one of the 50+ services in the HOCA File is the option of having a LAZ Customer Care Center employee available to answer questions from individuals entering or exiting a parking garage. There is a base operational cost LAZ incurs for each call (which is based on factors such as technology costs, wages for call center employees based on call volume, and installation of appropriate devices in the garage to transmit such calls), which in turn LAZ uses to determine its pricing to clients.

25. The HOCA file also includes proprietary cost information for the other 50+ services, including LAZ BI (which collects parking, demographic, sales and weather data and transforms it into actionable business insights), LAZgo (a mobile parking payment solution), and insurance coverage options for clients utilizing shuttle services.

26. The HOCA File is so sensitive that Meghan Reed (VP of Corporate Finance) emphasized and reiterated the sensitivity of the file: "I will circulate the password separately. As always, please consider these as highly sensitive . . . ." (*Id.*). To also place an emphasis on the sensitivity of the document, I forwarded the document to Starre and other Regional Controllers on July 9, 2025, specifically stating that "[t]his is not to be shared outside of our group." (*Id.*).

27. From my review of her LAZ email account, I learned that Starre used her LAZ email account to forward another 21 Company emails to her personal Gmail account between October 14, 2025 and November 3, 2025.

28. Included in these emails were screenshots of the 2026 budget for LAZ's Pennsylvania and Delaware operations, including amounts allocated to payroll, health insurance, workers' compensation, and shuttle insurance. A true and correct copy of the email transmitting this information is attached as Exhibit I to the Complaint; however, the Proprietary Information in this email has been redacted, and the proprietary attachments have been removed, to maintain confidentiality until a protective order is entered or this Court directs a complete copy to be filed under seal.

29. From my review of her LAZ email account, I learned that, after I informed Starre of her termination on November 4, 2025—but before her access to LAZ's email system had been turned off—Starre used her LAZ email account to forward another 35 Company emails to her personal Gmail account. Starre began sending this batch of emails immediately after the call communicating her termination had ended (*i.e.*, at approximately 10:00 a.m.), and it ended only when LAZ had turned off access to Starre's Company cell phone (*i.e.*, at approximately 1:30 p.m.). In this batch were:

   a. Various customer-specific documents, including one lease agreement, multiple rent calculation spreadsheets, and other itemized financial information for multiple Washington D.C.-based clients. A true and correct copy of the email transmitting this Proprietary Information are attached as Exhibits J-K to the Complaint; however, the Proprietary Information in these emails has been redacted, and the proprietary attachments have been removed, to maintain confidentiality until a

protective order is entered or this Court directs complete copies to be filed under seal.

b. An email chain listing regional financial results, budget comparisons, and lists of new and prospective clients with estimated revenues for each, with an attachment containing comprehensive financial information LAZ's Mid-Atlantic Region. A true and correct copy of the email transmitting this Proprietary Information is attached as Exhibit L to the Complaint; however, the Proprietary Information in this email has been redacted, and the proprietary attachments have been removed, to maintain confidentiality until a protective order is entered or this Court directs a complete copy to be filed under seal.

c. Revenue figures and rosters of parking customers (and LAZ's margins for each) for a large Baltimore-based client. A true and correct copy of the email transmitting the Proprietary Information is attached Exhibit M to the Complaint; however, the Proprietary Information in this email has been redacted, and the proprietary attachments have been removed, to maintain confidentiality until a protective order is entered or this Court directs a complete copy to be filed under seal.

d. Thousands of pages worth of data in multiple spreadsheets, each of which contain comprehensive financial information (profit, loss, actual revenue vs. budget) for each division of LAZ's business in the Mid-Atlantic Region. True and correct copies of the emails transmitting the Proprietary Information are Exhibits N-O to the Complaint; however, the Proprietary Information in these emails has been redacted, and the proprietary attachments have been removed, to maintain

confidentiality until a protective order is entered or this Court directs complete copies to be filed under seal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this 19th day of November 2025.

_____
Carolyn Maloney