IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| LAZ KARP ASSOCIATES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:25-cv-2111 (RDA/WBP) |
| ) | |
| ANILISE STARRE, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction (the "Motion"). Dkt. 4. Considering the Motion together with the memorandum in support (Dkt. 5), associated declarations (Dkts. 7-11), and oral argument at the December 10, 2025 hearing, the Court GRANTS-IN-PART Plaintiff's Motion and issues a temporary restraining order for the reasons that follow.

I.   BACKGROUND

Plaintiff LAZ KARP Associates, LLC ("Plaintiff", "LAZ", or the "Company") is a parking services corporation. On March 7, 2022, Defendant Anilise Starre ("Defendant") began her employment at LAZ as a Regional Controller over LAZ's Central East Coast Region, which included Pennsylvania, Baltimore, Virginia, and Washington, D.C. (the "Region"), and she primarily worked in LAZ's Washington, D.C. office. Dkt. 7 ¶ 7 (Carolyn Maloney Affidavit). Specifically, Defendant was responsible for the oversight of all accounting activity within the Region, including overseeing development of the Region's financial plan, solving operational and financial challenges with operational teams, performing financial analyses as requested by regional leadership, maintaining budgets for LAZ's locations within the Region, and serving as a liaison

between the Region's operations team and the home office in Connecticut for financial matters. *Id.* ¶ 10. In this role, Defendant had access to at least some of LAZ's financial documents, such as balance sheets, lists of operational costs for specific client services, and price scaling data. *Id.* ¶ 8. LAZ relies on this information for budgeting, determining employee wages, and setting competitive pricing for its clients. *Id.*

As a condition of their employment, Regional Controllers must certify that they are aware that their role requires access to substantial proprietary information and that they know that maintaining the confidentiality of such information is paramount to their role. *Id.* ¶ 9; Dkt. 9 ¶ 5(a) (Eric Daigle Affidavit). Specifically, these employees must sign a Confidentiality and Non-Solicitation Agreement (the "Agreement"). The Agreement states in relevant part:

> **1. CONFIDENTIALITY AS A CONDITION OF EMPLOYMENT**
>
> I have access to information pertaining to the Company's business that is of a confidential and secret character and of great value to the Company. I acknowledge that this "Proprietary Information" includes, but is not limited to, the following: customer lists; names of contact persons; customer records; trade secrets; business plans; methods of operation; marketing, pricing, and financial information pertaining to the business of the Company, and all other information now in existence or later developed which is similar to the foregoing; and all information which is marked as confidential or explained to be confidential.
>
> I recognize the importance of preserving the confidentiality of the Proprietary Information and agree to use my best efforts to protect the Proprietary Information from unauthorized disclosure.
>
> I agree to protect the Company's interest in the Proprietary Information and promise not to disclose, directly or indirectly, to any third parties any such matters or documents regardless of format or media upon which it is recorded, including any electronic or computer files, that contain such confidential information without written permission from the owner of the Company or otherwise in the normal course of my duties for the Company.
>
> I agree not to disclose, at any time, the Company's Proprietary Information and any other information acquired by me concerning the Company's business, to the extent it is not available to the public.

> I further recognize that the Company has received and in the future will receive from third parties their confidential or Proprietary Information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or Proprietary Information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.
>
> **2. EMPLOYEE'S ACCOUNTS, GOODWILL ESTABLISHED AND WORK PRODUCT SHALL BE THE PROPERTY OF THE COMPANY**
>
> I agree that all goodwill in the customers and accounts I establish or service, the Company documents prepared by me, work product involving Proprietary Information that I collect, customer records and other matters of a similar business nature, prepared by me or at my direction during the period of my employment, which relate to the business of the Company or to its demonstrably anticipated business shall be the sole and exclusive property of the Company and shall remain such after the termination of my employment, whether now existing or hereafter acquired by the Company.

Dkt. 1-2 at 2.  Defendant signed this Agreement on March 12, 2022.  *Id.* at 4; *see also* Dkt. 9 ¶ 9.

Defendant also received a Code of Conduct and Employee Handbook, and signed acknowledgements of each on March 14, 2022, and March 17, 2022, respectively.  Dkt. 1-6 (Employee Handbook); Dkt. 1-7 (Code of Conduct); *see also* Dkt. 9 ¶ 10.  In a section titled "Confidentiality and Trade Secrets," the Employee Handbook states in relevant part:

> During the course of employment with LAZ, employees will have access to, work with or develop inventions, valuable information and materials relating to LAZ's business that are not known or available outside LAZ.  This information, including but not limited to business plans, proposals, financial records and revenue reports among other regularly generated business documents, proprietary information and materials are broadly called "trade secrets" and are of great importance in our highly competitive business.  In order to retain their value, they must be kept confidential within LAZ.
>
> \*\*\*
>
> It is impossible to list all of the many types of trade secrets that exist, but a partial list would include: plans for and results of research and development, revenue estimates and histories, strategic plans, proposals, bids, responses to requests for proposals, ***income and expense documents***, identity of special suppliers, ***cost figures***, construction plans, marketing and advertising studies and plans, customer

3

> lists, and special techniques of any kind peculiar to LAZ's operations. Employees will find trade secrets disclosed or contained in memoranda, notes, reports, charts, drawings, blueprints, pictures, visual aids, samples, etc. ***These are examples of materials that every LAZ employee should safeguard carefully during employment with LAZ and leave behind as LAZ property in the event the employee goes elsewhere.***

Dkt. 1-6 at 27 (emphasis added). In a section titled "Confidential Information," the Code of Conduct states in relevant part:

> We require all employees to protect all confidential information belonging to or being held by LAZ Parking. Depending on the situation, this can include ideas, information, and materials that are gathered or generated as part of our Company efforts. Remember, even if the disclosure, loss, or destruction of confidential or proprietary information is accidental, it could still have a huge impact on our success, damage our reputation, and violate the privacy of customers and employees.
>
> You should protect all such information and intellectual property belonging to LAZ Parking related to records and information management. Secure laptops, portable devices, and storage media that may contain confidential or proprietary information, and follow all Company policies and procedures. ***Confidential data should never be transmitted to private unsecured sources under any circumstances*** (e.g., USB drives, ***personal email accounts***)

Dkt. 1-7 at 9 (emphasis added).

Beyond written agreements, LAZ also implements several physical and electronic access controls to protect proprietary information, including: (a) securing and locking LAZ facilities, (b) requiring employees to log in with unique credentials to access company devices, (c) using permission-restricted folders that only permit authorized employees to access certain information, and (d) requiring passwords when emailing sensitive documents within the Company to open the attachments. Dkt. 7 ¶ 6.

LAZ's Senior Director of Regional Finance, Carolyn Maloney, began supervising Defendant in or around July 2024. *Id.* ¶ 11. Immediately, she noticed that Defendant had performance issues, including providing inaccurate and incomplete deliverables, and Maloney

attempted to coach Defendant on an informal basis to help her improve. *Id.* ¶ 12. Others expressed concerns with Defendant's performance to Maloney. *Id.* ¶ 13. Maloney often received complaints that Defendant submitted delayed responses to requests and emails, and that members of the regional team did not trust Defendant to accurately or timely complete assigned tasks. *Id.*

In or around October 2025, at the recommendation of the Region's Vice President and Senior Vice President, Maloney created a performance improvement plan ("PIP") to address the areas where Defendant was struggling. *Id.* ¶ 14. The PIP was to last for seven weeks, and included weekly milestones, with check-ins with Maloney. *Id.* On October 7, 2025, Maloney sent Defendant a Microsoft Teams invitation for a call that was to take place on October 9, 2025, where the PIP would be presented. *Id.* ¶ 15.

Maloney reports that Defendant's performance did not sufficiently improve after the PIP was instituted and that Defendant did not express or exhibit a desire to improve to Maloney. *Id.* ¶ 16. During a call that Maloney had with Defendant on November 3, 2025, Maloney observed that Defendant was not willing to put forward the effort necessary to complete her seven-week PIP. *Id.* Maloney reports that, for this reason, and Defendant's prior history for poor performance, Maloney recommended that LAZ terminate Defendant's employment. *Id.* At or around 9:30 a.m. on November 4, 2025, Maloney informed Defendant that her employment was being terminated, effective immediately. *Id.* ¶ 17. The call ended at approximately 10:00 a.m., and Defendant turned in her Company laptop and left the office shortly thereafter. *Id.*

On or around November 5, 2025, Maloney accessed Defendant's Company email account to determine what outstanding requests Maloney may have needed to reassign to other Regional Controllers. *Id.* ¶ 18. After logging in to the email account, Maloney observed that Defendant had approximately 3,000 unread emails. *Id.* Maloney also noticed that Defendant used her LAZ email

account to forward over 90 emails to her personal Gmail account. *Id.* Maloney neither instructed nor knew that Defendant had sent LAZ's proprietary information to her personal email account. *Id.* ¶ 19. From Maloney's review of her LAZ email account, Maloney learned that Defendant used her LAZ email account to forward seven Company emails to her personal Gmail account on October 8, 2025. *Id.* ¶ 21. Maloney further learned that Defendant used her LAZ email account to forward another thirty-one Company emails to her personal Gmail account on October 10, 2025. *Id.* ¶ 22. Included among that batch of Company emails was LAZ's Home Office Cost Allocation ("HOCA") File. *Id.*; *see* Dkt. 1-9 (transmittal email).

The HOCA file is one of the most valuable pieces of Proprietary Information LAZ possesses, as it contains a list of over fifty services LAZ provides customers from its Connecticut-based headquarters (*i.e.*, the home office) and the baseline operational cost LAZ incurs for each such service for both 2025 and 2026. Dkt. 7 ¶ 23. For example, one of the services in the HOCA file is the option of having a LAZ Customer Care Center employee available to answer questions from individuals entering or exiting a parking garage. *Id.* ¶ 24. There is a base operational cost LAZ incurs for each call (which is based on factors such as technology costs, wages for call center employees based on call volume, and installation of appropriate devices in the garage to transmit such calls), which in turn LAZ uses to determine its pricing to clients. *Id.* The HOCA file also includes cost information for LAZ BI (which collects parking, demographic, sales, and weather data and transforms it into actionable business insights), LAZgo (a mobile parking payment solution), and insurance coverage for clients utilizing shuttle services. *Id.* ¶ 25. The HOCA file is so sensitive that Meghan Reed, the VP of Corporate Finance, emphasized and reiterated the sensitivity of the file: "I will circulate the password separately. As always, please consider these

as highly sensitive . . . ." *Id.* ¶ 26.  When Maloney forwarded the document to Defendant and other Regional Controllers, she stated, "[t]his is not to be shared outside of our group." *Id.*

From Maloney's review of Defendant's LAZ email account, Maloney also learned that Defendant used her LAZ email account to forward another twenty-one Company emails to her personal Gmail account between October 14, 2025, and November 3, 2025. *Id.* ¶ 27.  Included in these emails were screenshots of the 2026 budget for LAZ's Pennsylvania and Delaware operations, including amounts allocated to payroll, health insurance, workers' compensation, and shuttle insurance. *Id.* ¶ 28; Dkt. 1-10 (transmittal email).

Finally, Maloney learned that, after Maloney informed Defendant of her termination on November 4, 2025, but before Defendant's access to LAZ's email system had been turned off, Defendant used her LAZ email account to forward another thirty-five Company emails to her personal Gmail account. Dkt. 7 ¶ 29.  Defendant began sending this batch of emails immediately after the call communicating her termination had ended (*i.e.*, at approximately 1:30 p.m.). *Id.*  In this batch were (a) various customer-specific documents, including one lease agreement, multiple rent calculation spreadsheets, and other itemized financial information for multiple Washington, D.C.-based clients, Dkts. 1-11, 1-12 (transmittal emails), (b) an email chain listing regional financial results, budget comparisons, and lists of new and prospective clients with estimated revenues for each, with an attachment containing comprehensive financial information for LAZ's Mid-Atlantic Region, Dkt. 1-13, (c) revenue figures and rosters of parking customers, and LAZ's margins for each, for a large Baltimore-based client, Dkt. 1-14, (d) thousands of pages worth of data in multiple spreadsheets, each of which contain comprehensive financial information, such as profit, loss, actual revenue vs. budget, for each division of LAZ's business in the Mid-Atlantic Region, Dkts. 1-15, 1-16.  Dkt. 7 ¶ 29.

On November 5, 2025, LAZ sent a letter to Defendant, demanding the return of these emails and all Company property. Dkt. 10 ¶ 5 (Hilary Cantone affidavit); Dkt. 1-3 (November 5 letter). On November 5 and 6, LAZ also left voicemails for Defendant on her personal cell phone, asking for a returned call so LAZ's Human Resources department could overnight Defendant's final pay to her home address instead of the P.O. box LAZ had on file for her. Dkt. 8 ¶¶ 7-8. On November 6, LAZ sent a text to Defendant's personal cell phone regarding the address for her final pay and "confidential documents [Defendant] forwarded to [her] personal email account." *Id.* ¶ 9. On November 7, 2025, LAZ sent a second letter to Defendant, again demanding the return of the emails and all Company property. Dkt. 10 ¶ 6; Dkt. 1-4 (November 7 letter). On November 14, 2025, outside counsel for LAZ emailed a third letter to Defendant's personal email address regarding her obligations to return LAZ's proprietary information and property. Dkt. 11 ¶ 2; Dkt. 1-5 (November 14 letter). LAZ has not received a response to any of these communications.

On November 19, 2025, LAZ filed a complaint alleging breach of contract (Count I), violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* (Count II), and violation of the Virginia Trade Secrets Act, Va. Code § 59.01-336 to 59.10343, *et seq.* (Count III). Dkt. 1. LAZ also filed the instant Motion for Preliminary Injunction, Dkt. 4, requesting that Defendant, and any other person collaborating with Defendant or acting in concert with Defendant, be (1) "[r]estrained and enjoined from accessing, using, disclosing, sharing, or making available to any person or entity other than LAZ, any of LAZ's Proprietary Information"; (2) "[r]estrained and enjoined from altering, destroying, or disposing of any evidence including documents, communications, information, or other tangible or intangible things, in any form, relating to (i) LAZ, (ii) the claims asserted by LAZ in this action, or (iii) [Defendant's] acquisition, use, transfer, or disposal of LAZ's Proprietary Information and/or property"; and (3) "[r]equired to account for

(through expedited discovery) and return to LAZ any and all of LAZ's property, including its Proprietary Information, wherever it resides or is stored, and with a full accounting [of] to whom any such property has been disseminated," Dkt. 4-1 (proposed order).

On December 5, 2025, Magistrate Judge Porter granted LAZ's motion for service by email, Dkt. 23, and that evening, LAZ emailed Defendant the summons, a copy of the complaint, Plaintiff's Motion for Preliminary Injunction, Plaintiff's Memorandum in support of its Motion for Preliminary Injunction, the Notice of Hearing for December 10, 2025, and a copy of Judge Porter's order, Dkt. 24.

On December 10, 2025, this Court held a hearing on the Motion at which counsel for Plaintiff appeared and Defendant appeared *pro se*. Plaintiff presented argument in support of its Motion. Defendant requested 45 days to retain counsel to review the matter. The Court granted Defendant's request and set a status for January 28, 2026.

## II. STANDARD OF REVIEW

Preliminary injunctions and temporary restraining orders are "extraordinary remed[ies] never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Such requests "involv[e] the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017). To be eligible for a preliminary injunction or a temporary restraining order, Plaintiff must demonstrate each of the following factors by a "clear showing": (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities between the parties tips in favor of the party seeking such relief; and (4) the public interest favors equitable relief. *Winter*, 555 U.S. at 20, 22.

III.    ANALYSIS

A review of the factors set forth in *Winter* establishes that Plaintiff has satisfied its burden to obtain a limited temporary restraining order to maintain the status quo until Defendant has the opportunity to retain counsel to review the matter. Accordingly, the Court will grant-in-part the pending Motion. The Court analyzes each of the necessary elements below.

A.    Notice and Scope of Relief

Federal Rule of Civil Procedure 65, which governs the issuance of injunctions, states, "No preliminary injunction shall be issued without notice to the adverse party." Fed. R. Civ. P. 65(a)(1). "Because a preliminary injunction is unlimited in duration, its entry always requires notice to the opposing party sufficient to give that party an opportunity to prepare an opposition to entry of an injunction." *Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000). Here, Plaintiff was emailed a copy of the relevant paperwork on Friday evening before a Wednesday morning hearing. Plaintiff represented that she opened the email on Monday and promptly began searching for an attorney to review the matter but that she needed more time to do so. Accordingly, the Court finds that the notice here is insufficient for the full preliminary injunction sought by Plaintiff.

However, the Court finds that the actual notice here is sufficient for a limited temporary restraining order to maintain the status quo until the status conference set for January 28, 2026, in this case—though, as always, Defendant may file an appropriate motion to dissolve the TRO sooner if she or any counsel she may retain decides to do so. *See id.* ("The interplay between Rule 65(a) (governing preliminary injunctions) and Rule 65(b) (governing TROs) is fluid, requiring greater procedural formality and notice for preliminary injunctions that remain operative for an unlimited time period. Thus, Rule 65(b), which authorizes a ten-day TRO *without notice* to the defendant, nevertheless includes a requirement that whatever notice is practical be given. And

while a TRO of limited duration may be issued upon the filing of an application without notice to the defendant, the party served with a TRO may seek dissolution of it upon two days' notice, or less if so ordered by the court."). Accordingly, upon finding that the notice requirement would not preclude the issuance of a narrowly tailored TRO here, the Court turns to the *Winter* factors to determine if such a TRO is substantively warranted.

### B. Likelihood of Success on the Merits

"Finding a likelihood of success on only one claim is sufficient to justify injunctive relief." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 494 n.3 (E.D. Va. 2021). Here, under the both the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and the Virginia Uniform Trade Secrets Act ("VUTSA"), Va. Code § 59.1-336, *et seq.*, a plaintiff must show (1) "the existence of a protectable trade secret," and (2) "misappropriation of that trade secret." *Variable Annuity*, 535 F. Supp. 3d at 515. Both the DTSA and the VUTSA allow "actual or threatened misappropriation" to be enjoined. *See* 18 U.S.C. § 1836(b)(3); Va. Code § 59.1-337.

Beginning with the first element, a protectable trade secret broadly encompasses "all forms and types of financial, business, scientific, technical, economic, or engineering information," including "compilations" thereof, that (i) derive "economic value from not being known to, and not readily ascertainable by" others, and (ii) are the subject of "reasonable efforts" to maintain its secret. *See* 18 U.S.C. § 1839(3); *see also Variable Annuity*, 535 F. Supp. at 513 ("[N]early any type of information can be subject to trade secret protections under [the VUTSA], so long as the information (i) has independent economic value by virtue of its being secret and (ii) is subject to reasonable efforts to maintain that secrecy.").

Here, the alleged trade secrets include highly sensitive cost information for over fifty services, regional financial results and budget comparisons, new and prospective clients with

11

estimated revenues for each, and a lease agreement. Courts routinely find that that such information derives economic value from secrecy. *See, e.g.*, *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1042 (D.S.C. 2021) (holding information about plaintiff's "finances, prices, margins, customer contracts, product strengths and weaknesses, product strategies, business plans, projects estimates, costs, pricing, [and] customer lists" are all trade secrets); *Fid. Glob. Brokerage Grp., Inc. v. Gray*, 2010 WL 4646039, at *2 (E.D. Va. Nov. 9, 2010) ("The information at issue here, [plaintiff's] customer lists and customer information, easily qualifies."); *Variable Annuity*, 535 F. Supp. 3d at 495, 513 (client contact and financial information constitutes a trade secret).

Moreover, Plaintiff took reasonable steps to preserve the secrecy of its information, including sharing only on a need-to-know basis and using password-protected files, confidentiality agreements, and proprietary information policies. *See, e.g.*, *Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 403 (4th Cir. 2005) (affirming grant of preliminary injunction where information was kept on password-protected server and "employees signed either a nondisclosure or a noncompetition agreement, or both"); *Hilb Grp. of New England, LLC v. Lavorgna*, 2024 WL 3234060, at *5 (E.D. Va. June 28, 2024) ("Plaintiff has shown that it took reasonable measures to keep this information secret by requiring [defendant], and all of its employees, to sign confidentiality agreements."); *Variable Annuity*, 535 F. Supp. 3d at 514 (finding plaintiff's protection of information was reasonable where it used "several layers of user IDs and passwords, limit[ed] its availability to a need-to-know basis, and restrict[ed] its access by requiring all financial advisors to execute confidentiality agreements"). Accordingly, the Court finds that Plaintiff is likely to succeed in proving the first element.

The second element—misappropriation—occurs when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i). *See also* Va. Code § 59.1-336 (same). Improper means under both statutes "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Variable Annuity*, 535 F. Supp. 3d at 515 (quoting 18 U.S.C. § 1839(6)); *see also* Va. Code § 59.1-336 (same).

Here, after signing multiple agreements establishing and acknowledging her duty to maintain the secrecy of such information, Defendant forwarded herself emails containing trade secrets before and after she was terminated. Courts in the Fourth Circuit have routinely held that a former employee sending trade secrets to his or her personal devices in similar circumstances constitutes actual or threatened misappropriation under the DTSA. *See, e.g.*, *Hilb Grp.*, 2024 WL 3234060, at *5 (defendant employee "acquired [plaintiff employer's] trade secrets by improper means" where defendant "obtained the information by emailing it to his personal email account in violation of his employment agreement"); *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 133 (D. Md. 2020) (holding plaintiff was likely to succeed on showing former employee misappropriated plaintiff's trade secrets "by downloading them for future personal use, without any legitimate [plaintiff] business purpose"); *Maximus, Inc. v. Holdren*, 2024 WL 1756342, at *2 (E.D. Va. Mar. 15, 2024) ("[Plaintiff] is likely to establish that [defendant] threatened to misappropriate its trade secrets by [*inter alia*] . . . forwarding work emails to her personal email accounts . . . ."); *GlaxoSmithKline, LLC v. Brooks*, 2022 WL 463070, at *1, *3 (D. Md. Feb. 15, 2022) (plaintiff likely to succeed on DTSA claim where former employee "emailed documents containing [plaintiff's] Trade Secrets and Confidential Information to her personal email address

13

in the days before and after her resignation"). Accordingly, the Court finds that Plaintiff is also likely to succeed in proving the second element of its misappropriation of trade secrets claims.

Because both elements are likely satisfied, the Court finds that Plaintiff has shown that it is likely to succeed on its misappropriation of trade secrets claims. Because the Court finds that Plaintiff is likely to succeed on its misappropriation claims, it does not reach the breach of contract claim.

### C. Irreparable Harm

Courts in the Fourth Circuit recognize that the disclosure of trade secrets constitutes irreparable harm. *See Peraton, Inc. v. Raytheon Co.*, 2017 WL 11501665, at *4 (E.D. Va. Nov. 7, 2017) ("The disclosure of trade secrets establishes immediate irreparable harm because a trade secret, once lost is, of course, lost forever." (cleaned up) (quoting *Home Funding Grp., LLC v. Myers*, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006))). And "a complainant need not allege or prove irreparable harm when it involves a statute that authorizes injunctive relief [such as the VUTSA and DTSA here]. All that need be proved is a violation of the statute." *Peraton*, 2017 WL 11501665, at *4 (quoting *Capital Tool & Mfg. Co., Inc. v. Maschinenfabrik Herkules, Hans Thoma GmgH*, 837 F.2d 171, 172 (4th Cir. 1988)). Because Plaintiff is likely to succeed on the merits of its trade secrets claims, Plaintiff has sufficiently demonstrated the threat of irreparable harm necessary here.

### D. Balance of the Equities

Where "the only harm Defendants would suffer is the self-inflicted harm that comes to those who base their businesses on trade secrets stolen from a competitor, . . . a balancing of the equities strongly favors granting an injunction." *API Technical Svcs, LLC v. Francis*, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) (quoting *E.I. du Font de Nemours & Co. v. Kolon Indus.*,

*Inc.*, 894 F. Supp. 2d 691, 709 (E.D. Va. 2012)). Accordingly, the balance of the equities also favors granting a limited temporary restraining order to maintain the status quo.

E. Public Interest

Courts in this District have previously held that "there is certainly a significant public interest in maintaining the confidentiality of trade secrets and preventing their misappropriation." *MicroStrategy, Inc. v. Business Objects, S.A.*, 369 F. Supp. 2d 725, 736 (E.D. Va. 2005); *Peraton*, 2017 WL 11501665, at *4; *see also Salomon & Ludwin, LLC v. Winters*, No. 3:24-CV-389-HEH, 2024 WL 3511629, at *6 (E.D. Va. July 23, 2024) ("The public interest favors the protection of confidential business information."); *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 142 (D. Md. 2020) ("[T]he public interest favors the protection of trade secrets, and the prevention of unfair business practices."). And "[t]he injunction provisions in VUTSA and DTSA reflect a legislative recognition that the public interest is furthered by the protection of trade secrets through appropriate injunctive relief." *Peraton*, 2017 WL 11501665, at *4. Thus, the public interest also favors granting a narrow temporary restraining order.

IV. Security Bond

Courts "may issue a . . . temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). A district court has discretion to set the bond amount where it deems proper, but "it is not free to disregard the bond requirement altogether." *Hoechst Diafoil Co.*, 174 F.3d at 421.

In trade-secret misappropriation cases, courts sometimes set bond between $100,000 and $200,000. *See, e.g., Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 724 & n.14 (M.D.N.C. 2009) (awarding $100,000 bond after enjoining former employee from working for a

15

competitor and from disclosing plaintiff-former employer's confidential information). Under appropriate circumstances, however, courts have also issued nominal bonds in trade secret misappropriation cases. *See Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 145 (D. Md. 2020) (setting bond of $10,000 in trade secret misappropriation case because the defendants did not show evidence of likelihood of harm and were free to continue their business without using confidential information of the plaintiff); *U.S. Healthtek v. Negosian*, 2025 WL 665533, at *7 n. 9 (E.D. Va. Feb. 28, 2025) (setting bond of $10,000); *Blades of Green, Inc. v. Go Green Lawn and Pest, LLC*, 2022 WL 326473 (D. Md. 2022) (requiring a $100 nominal bond); *ICENY USA, LLC v. M & M's, LLC*, 421 F. Supp. 3d 204, 224 (D. Md. 2019) (ordering a $2,000 bond).

Here, there does not appear to be a likelihood of harm stemming from entry of a limited temporary restraining order maintaining the status quo as Defendant may seek or continue other employment without using the information at issue here. "The fact that [Defendant] may lose some opportunity because of an injunction's issuance, due to their own previous misconduct, is not a relevant harm." *Brightview Grp.*, 441 F. Supp. 3d at 145. Nevertheless, out of an abundance of caution, the Court will require Plaintiff to post a $5,000 bond. This amount is more than ample to account for any harm that could accrue to Defendant due to the temporary restraining order.

## V.   CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Motion for Preliminary Injunction (Dkt. 4) is GRANTED-IN-PART; and it is

FURTHER ORDERED that Defendant, and any other person collaborating with Defendant or acting in concert with Defendant, are hereby ENJOINED from accessing, using, disclosing, sharing, or making available to any person or entity other than LAZ, any of LAZ's Proprietary Information until further order by this Court; and it is

16

FURTHER ORDERED that Defendant, and any other person collaborating with Defendant or acting in concert with Defendant, are hereby ENJOINED from altering, destroying, or disposing of any evidence including documents, communications, information, or other tangible or intangible things, in any form, relating to (i) LAZ, (ii) the claims asserted by LAZ in this action, or (iii) Defendant's acquisition, use, transfer, or disposal of LAZ's Proprietary Information and/or property until further order by this Court; and it is

FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 65(c), Plaintiff post a bond of $5,000 with respect to the temporary restraining order granted herein to be taken in by the Clerk's office to go into a non-interest-bearing account; and it is

FURTHER ORDERED that this temporary restraining order shall remain in effect through January 28, 2026; and it is

FURTHER ORDERED that a status conference in this case is SET for 10:00 a.m. on January 28, 2026; and it is

FURTHER ORDERED that all deadlines in this case are STAYED until January 28, 2026.

The Clerk is directed to forward a copy of this Order to Defendant and all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
December 12, 2025

/s/ 
Rossie D. Alston, Jr.
United States District Judge